UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DISTRICT

NYLA PERRIN, as PERSONAL
REPRESENTATIVE OF THE ESTATE
OF YOLANDA THOMAS,

        Plaintiff,                Case No. 17-cv-10558
                                    Hon. Mark A. Goldsmith

v

STATE FARM MUTUAL AUTOMOBILE
INSURANCE CO.,

        Defendant.

---

| ROBERT M. SMITH (P31191) | MICHAEL W. SLATER (P65227) |
|---|---|
| DAILEY LAW FIRM, P.C. | CHASE M. KUBICA (P74151) |
| Attorney for Plaintiff | PLUNKETT COONEY |
| 36700 Woodward Ave., Ste. 107 | Attorneys for Defendants |
| Bloomfield Hills, MI 48304 | 38505 Woodward Ave., Ste. 100 |
| (248) 744-5005 | Bloomfield Hills, MI 48304 |
| rsmith@daileylawyers.com | (248) 594-2703 |
| | ckubica@plunkettcooney.com |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY'S MOTION FOR LEAVE TO FILE A SECOND MOTION FOR SUMMARY JUDGMENT

Now comes Plaintiff, Nyla Perrin as Personal Representative of the Estate of Yolanda Thomas, by and through her attorney, Robert M. Smith of the Dailey Law Firm, P.C., and for her Response to Defendant's Motion for Leave to File a Second Motion for Summary Judgment states as follows:

1

1. Plaintiff admits that, through Counsel, she refused to stipulate to the entry of an order to allow Defendant to file a Second Motion for Summary Judgment because she denies that her attendant care was provided by an unregistered and unlicensed Adult Foster Care Facility.    As to the remainder of the allegations contained in paragraph 1 Plaintiff neither admits nor denies for the reason, she lacks information upon which to form a belief as to the truth or falsity thereof;

2. Plaintiff admits that there were multiple collisions injuring Plaintiff during the time she was insured by State Farm Mutual Automobile Insurance Company. As to the remainder of the allegations contained in paragraph 2 Plaintiff neither admits nor denies for the reason, she lacks information upon which to form a belief as to the truth or falsity thereof;

3. Plaintiff admits the alleged description allegations of Defendant's proposed Second Motion for Summary Judgment but further denies the allegations contained therein as untrue and contrary to fact and law, specifically MCL 400.704 (7).

4. Admit;

5. Admit;

6. Plaintiff admits that Defendant was aware, at the time that it filed its first Motion for Summary Judgment, that Plaintiff's attendant care provider,

One Life Care Services was not licensed by the State of Michigan as an Adult Foster Care Facility, but further denies that said facility required a license at the time. Further, Plaintiff denies that additional affidavits submitted with her Case Evaluation Summary in any way indicate that One Life Services required a license as an Adult Foster Care Facility under the laws of the State of Michigan;

7. Plaintiff denies that Defendant was not able to confirm its suspicions that One Life Care Services was operating as an unlicensed Adult Care Facility until it allegedly received additional "never seen before attendant care forms" for the reason that it _**knew**_ One Life Care Services did not have any licenses at the time that it completed the deposition of Johnny Hunter and that prior attendant care affidavits that it had in its possession and even submitted in support of its _**prior**_ Motion for Summary Judgment show claims had been and were being made at various times, during Plaintiff's care, that showed attendant care was being provided for 24 hours.

8. Plaintiff denies that Defendant was not able to confirm this alleged "new information" for the reason that the alleged information was not, in fact, new, but merely supplemented to indicate that a high amount of payment for services was being presented based upon new information and belief as to the actual value of the services being rendered.

9. Admit;

10. Admit;

11. Admit;

12. Plaintiff denies this as untrue for the reason that at the time Defendant filed its first Motion for Summary Judgment, Defendant was well aware that One Life Care Services was not licensed in any fashion by the State of Michigan and 24-hour attendant care services were being sought on behalf of the Plaintiff at various intervals during the duration of her need for such services.

13. Plaintiff admits this allegation but further denies that Defendant can show "good cause" for its failure to comply with this Court's Scheduling Order.

14. Plaintiff denies this allegation as untrue and contrary to fact for the reason that Defendant could have filed its Motion for Summary Judgment at the same time that it filed its prior Motion for Summary Judgment because the information that Defendant claims it did not have until two days prior to the scheduled case evaluation was well within the knowledge of the Defendant at the time of the first motion as clearly evidenced by the exhibits attached hereto.

15. Plaintiff denies that here is no prejudice because Defendant's delay in bringing this untimely motion has resulted in Yolanda Thomas being

unavailable to assist in the defense of this motion and prosecution of her

claim due to her demise.

16. Plaintiff can neither admit nor deny this allegation as she lacks sufficient

information upon which to form a belief.

17. Plaintiff denies this allegation as untrue because Defendant's delay in

having brought its motion has prevented Yolanda Thomas in assisting in

the defense of this motion due to her demise.

18. Plaintiff admits that a trial date has not been scheduled for this matter but

denies that Plaintiff has ample opportunity to respond to Defendant's

motion as Yolanda Thomas has passed away and is no longer available to

assist in the defense of a motion that should have and could have been filed

by March 15, 2018 at which time Yolanda Thomas was still alive.

19. I, Robert M. Smith, certify that this document complies with Local Rule

5.1(a).  I also certify that it is the appropriate length per Local Rule

7.1(d)(3).

WHEREFORE, Plaintiff, Nyla Perrin as Personal Representative of the

Estate of Yolanda Thomas, respectfully prays that this Honorable Court deny

Defendant's Motion to file its Second Motion for Summary Disposition.

/s/ Robert M. Smith
ROBERT M. SMITH (P31191)
DAILEY LAW FIRM, P.C.
Attorney for Plaintiff
36700 Woodward Ave., Ste107
Bloomfield Hills, MI 48304
(248) 744-5005
rsmith@daileylawyers.com

Dated:  March 21, 2019

PROOF OF SERVICE
I certify that a copy of the above document was served
upon all counsel of record at their respective business
address as disclosed by the pleadings of record by:

_____ US Mail 1st Class \_\_\_\_ Facsimile
_____ US Mail Certified \_\_\_X\_\_ Efiled
_____ Hand _____ Emailed

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————

NYLA PERRIN as PERSONAL
REPRESENTATIVE OF THE ESTATE
OF YOLANDA THOMAS,

             Plaintiff,

Vs.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

             Defendant.

Case No. 2:17-cv-10558-mag-drg
Honorable Mark A. Goldsmith.

| | |
|---|---|
| Brian Dailey (P39945) | PLUNKETT COONEY |
| Robert M. Smith (P31191) | Michael W. Slater (P65227) |
| DAILEY LAW FIRM, P.C. | Chase M. Kubica (P74151) |
| *Attorneys for Plaintiff* | *Attorneys for Defendant State Farm* |
| 36700 Woodward Ave, Suite 107 | 38505 Woodward Avenue, Suite 100 |
| Bloomfield Hills, Michigan 48304 | Bloomfield Hills, MI 48304 |
| (248) 744-5005 / (248) 744-4440 [F] | (248) 594-2703 |

**BRIEF IN SUPPORT OF PLAINTIFF'S ANSWER TO DEFENDANT'S
MOTION FOR LEAVE TO FILE ITS SECOND MOTION FOR SUMMARY
JUDGMENT**

1

## **TABLE OF CONTENTS**

1.  **INTRODUCTION/RELEVANT FACT………………………………..5**
2.  **LEGAL ANALYSIS…………………………………………………...6**

# <u>INDEX OF AUTHORITIES</u>

**Statutes**
**M.C.L. 400.704(7) …………………………….………………………………...9**

## **ISSUE PRESENTED**

Should the Court grant Defendant Leave to File its Second Motion for Summary Disposition?

Plaintiff answers:          No.

I.    **INTRODUCTION/RELEVANT FACTS**

Plaintiff's cause of action against Defendant arises out of two motor Vehicle accidents which occurred on January 7, 2014 and November 24, 2014. Defendant filed its original Answer, Affirmative Defenses and Jury Demand on March 27, 2017. [Docket No. 7] On December 19, 2017, this Honorable Court entered an Amended Case Management and Scheduling Order December 19, 2017 [Docket No. 31] Under the deadlines of said Order, dispositive motions were to have been filed on or before March 15, 2018 with all other motions being due on or before July 2, 2018.  All discovery closed as of March 1, 2018.

Discovery was conducted over several months and featured the depositions of the late Yolanda Thomas (taken December 4, 2017), Johnny Hunter (taken February 19, 2018) and Dr. Marvin Bleiberg (taken February 1, 2018).

After discovery was concluded, Defendant filed its First Motion for Summary Disposition on March 15, 2018.  The sum and substance of said motion was the Plaintiff had made fraudulent misrepresentations as regards to her claim for attendant care which was being provided through One Life Care Services, a facility owned and operated by Johnny Hunter and, as such, her claim for No-Fault Benefits was barred under Michigan Law.

This Honorable Court entered an Opinion and Order Denying Defendant State Farm's Motion for Summary Judgment on November 1, 2018. [Docket No. 51] stating that a jury could conclude that Plaintiff did not intend to defraud State

5

Farm and therefore an issue of fact remained.

Defendant now seeks this Court's permission to file a Second Motion for Summary Judgment. Plaintiff objects to same for the reason that Defendant was well aware of the circumstances giving rise to its second motion at the time that it filed its first motion and simply failed to file the motion in a timely manner. Additionally, by delaying the filing of a second motion, the Defendant has inadvertently denied the Plaintiff's counsel the benefit of the Plaintiff's assistance in defending against the motion due to the Plaintiff's demise on January 4, 2019.

## II.    LEGAL ANALYSIS

Defendant's Motion is untimely and late under the terms of this Court's Order. The Order Amending the Case Management and Scheduling Order required that dispositive motions had to be filed by March 15, 2018. **[Exhibit A]** Defendant not only was aware of this restriction, it actually filed its First Motion for Summary Judgment on that date (Dkt. No. 35)  Defendant claims that it was not aware of the circumstances giving rise to its second Motion for Summary Disposition until only two days prior to the scheduled Case Evaluation when it received Plaintiff's Evaluation Summary which was accompanied by affidavits in support of attendant care being provided by One Life Services, a facility owned and operated by Johnny Hunter. Defendant claims it had no way of knowing that 24-hour attendant care was being claimed by the Plaintiff until it received the affidavits and that, once it did, it promptly filed its Motion for Summary Disposition that was ultimately stricken by

6

this Court as being untimely and without permission resulting in this very motion.

Unfortunately for the Defendant, that facts and evidence contradict Defendant's claim.

State Farm Mutual Automobile Insurance Company wants this Court to believe that One Life Care Services was operating an unlicensed Adult Foster Care Facility and, therefore, it does not have to pay for the attendant care services that it provided for Yolanda Thomas. In support of this theory, State Farm is claiming that Yolanda Thomas was receiving 24-hour care which would require One Life Care Services to have a license from the State of Michigan to operate an Adult Foster Care Facility. In addition to this, State Farm is claiming that it had no way of knowing this before March 15, 2018 and that it didn't learn of the 24-hour care being claimed until two days before the scheduled case evaluation. This is all untrue.

In its Motion, Defendant admits that affidavits, submitted on behalf of Yolanda Thomas, claimed 24-hour care during the months of September and October of 2015, a time which was ultimately barred by the one year back rule of the No-Fault Law. (Dkt. No 30) It claims that it had no idea that additional 24-hour care was being claimed until it received Plaintiff's case evaluation summary. However, as evidenced by affidavits submitted on behalf of the Plaintiff for August 2016, February 2017 and April 2017 **[Exhibit B]** Plaintiff has indeed requested reimbursement for 24-hour care and submitted affidavits in support of same **all before the time for the cut-off date for the filing of dispositive motions.**

7

(Emphasis added).   Defendant asserts that knowledge of a claim for 24-hour attendant care triggered it first being aware of the possibility of a defense of the claim being barred due to One Life Care Services operating as an unlicensed Adult Foster Care Facility and that it didn't have this knowledge until receipt of Plaintiff's case evaluation summary.   The problem with this claim is that the aforementioned affidavits for August 2016, February 2017 an April 2017 were all discussed and questioned during the course of the discovery deposition of Johnny Hunter which was conducted February 19 2018, at a time when Yolanda Thomas was still alive and was able to assist in the prosecution of her claim and defense of any motions for summary judgment. **[Exhibit C]**

On page 14 of **Exhibit C** of Mr. Hunter's testimony, counsel for the Defendant is clearly reviewing certain affidavits that had been submitted in support of Yolanda Thomas' claim for attendant care. He clearly asks about the affidavits for August 2016, February 2017 and April 2017!  Since those particular affidavits requested reimbursement for 24-hour care, Defendant cannot justifiably assert that it did not have knowledge that claims for 24-hour care until December 19, 2018 at which time Defendant initially filed its second Motion for Summary Judgment.

Defendant's attempt to bring another dispositive motion after the court appointed deadline for same is untimely, late and without any justification for the delay being present.

In addition to Defendant's Second Motion for Summary Judgment being

8

untimely, late and without any justification for the delay, it is essentially without merit.  Defendant asserts, and has asserted since it conducted the deposition of Johnny Hunter, that One Life Care Services was operating as an unlicensed Adult Foster Care Facility.  However, the fact remains that the circumstances of the care being provided by One Life Care Services for Yolanda Thomas did not require One Life Services to be licensed because it was not operating as an Adult Foster Care Facility as defined by Michigan law, specifically MCL 400.704(7) which states:

> ""Foster care" means the provision of supervision, personal care, and protection in addition to room and board, for 24 hours a day, 5 or more days a week, and for 2 or more consecutive weeks for compensation."

As evidenced by the affidavit of Candance Pilarski **[Exhibit D]** of the State of Michigan Department of Licensing and Regulatory Affairs Bureau of Community and Health Systems, unless all of the elements of the definition of "foster care" at MCL 400.704(7) are met, a person or corporation **does not need an adult foster care license.** (Emphasis added)

Further, as evidenced by the attached affidavit of Johnny Hunter, the owner and operator of One Life Care Services, his company did not provide either supervision or protection as defined under the Adult Foster Care Facility Licensing Act. **[Exhibit E]**

Because the law did not require One Life Care Services to obtain a license to operate as an Adult Foster Care Facility, it was not operating as one and, therefore, Defendant's assertion that the law bars claims for attendant care is without merit and

9

therefore, allowing Defendant to file a second Motion for Summary Judgment would be without merit.

WHEREFORE, Plaintiff, Nyla Perrin as Personal Representative of the Estate of Yolanda Thomas respectfully prays that this Honorable Court deny Defendant's Motion to file its Second Motion for Summary Judgment.

Respectfully submitted:

/s/*Robert M. Smith*
ROBERT M. SMITH(P31191)
DAILEY LAW FIRM P.C.
Attorney for Plaintiff
36700 Woodward Ave., Ste 107
Bloomfield Hills, MI 48304
(248) 744-5005

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was served on all parties in accordance with the Federal Rules of Civil Procedure on March 21, 2019.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

NYLA PERRIN as PERSONAL
REPRESENTATIVE OF THE ESTATE
OF YOLANDA THOMAS,

                        Case No. 2:17-cv-10558-mag-drg

        Plaintiff,              Honorable Mark A. Goldsmith.

Vs.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

        Defendant.

---

| | |
|---|---|
| Brian Dailey (P39945) | PLUNKETT COONEY |
| Robert M. Smith (P31191) | Michael W. Slater (P65227) |
| DAILEY LAW FIRM, P.C. | Chase M. Kubica (P74151) |
| *Attorneys for Plaintiff* | *Attorneys for Defendant State Farm* |
| 36700 Woodward Ave, Suite 107 | 38505 Woodward Avenue, Suite 100 |
| Bloomfield Hills, Michigan 48304 | Bloomfield Hills, MI 48304 |
| (248) 744-5005 / (248) 744-4440 [F] | (248) 594-2703 |

---

## INDES OF EXHIBITS TO PLAINTIFF'S ANSWER TO DEFENDANT'S MOTION FOR LEAVE TO FILE ITS SECOND MOTION FOR SUMMARY JUDGMENT

    A. Order Amending Case Management and Scheduling Order dtd 12-19-17
    B. Attendant Care Affidavits dtd 816, 2-17, 4-17.
    C. Dep transcript of Johnny Hunter
    D. Affidavit of Candace Pilarski
    E. Affidavit of Johnny Hunter

1

# EXHIBIT A

P&A FILE NO. 11-43565

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YOLANDA THOMAS,

       Plaintiff,

vs.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

       Defendant.

_____/

Civil Action No. 17-CV-10558

HON. MARK A. GOLDSMITH

### ORDER AMENDING
### CASE MANAGEMENT AND SCHEDULING ORDER

The parties had a telephonic status conference on December 13, 2017,

IT IS ORDERED that the Case Management and Scheduling Order is amended as follows:

| EVENT | DEADLINE |
|---|---|
| Expert Witness List/Disclosures/Report - Plaintiff | January 22, 2018 |
| Expert Witness List/Disclosures/Report - Defendant | February 19, 2018 |
| Fact Discovery | February 1, 2018 |
| Expert Discovery | March 1, 2018 |
| Dispositive Motions & Motions to Limit/Exclude Expert Testimony | March 15, 2018 |
| All Other Motions, Including Motions in Limine | July 2, 2018 |
| Final Settlement Conference | July 16, 2018 @ 1:30 p.m. |
| Joint Final Pretrial Order | July 2, 2018 |
| Final Pretrial Conference | August 13, 2018 @ 1:30 p.m. |
| Trial - Jury | August 27, 2018 @ 8:30 a.m. |

No further adjournments of the dispositive or expert-related motion cutoff date or trial date will be granted

SO ORDERED.

Dated: December 19, 2017
      Detroit, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge

# EXHIBIT B

AFFIDAVIT OF ATTENDANT CARE SERVICES PEFORMED

Name of Insured:

Yolanda Thomas                    Date of Incident: 11/24/14

Claim#22569H8

30

Service Provider's Name:

One Life Care Services

Describe specifically what attendant care services were provided:

A. Assistance with Hygiene

B. Grooming

C. Bathing

D. Toileting                              I. Medication Management

E. Transferring/Positioning               J. Care of Health Equipment

F. Physical Therapy Oversight             K. Management of Finances

G. Eating                                 L. Wound Care

H. Meal Preparation                       M. Safety Supervision

On the following calendar, please indicate: (a) the services by letter; (b) the dates on which those services were performed; and (c) the number of hours required for performance of those services for each date.

**Month: April**

| 1 A, B, C, D, E, F, G, H, I, M | 2 A, B, C, D, E, F, G, H, I, M | 3 A, B, C, D, E, F, G, H, I, M | 4 A, B, C, D, E, F, G, H, I, M | 5 A, B, C, D, E, F, G, H, I, M | 6 A, B, C, D, E, F, G, H, I, M | 7 A, B, C, D, E, F, G, H, I, M |
|---|---|---|---|---|---|---|
| Hours: 24 | Hours: 24 | Hours: 24 | Hours:24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 8 A, B, C, D, E, F, G, H, I, M | 9 A, B, C, D, E, F, G, H, I, M | 1D A, B, C, D, E, F, G H, I, M | 11 A, B, C, D, E, F, G, H, I, M | 12 A, B, C, D, E, F, G, H, I, M | 13 A, B, C, D, E, F, G, H, I, M | 14 A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 15 A, B, C, D, E, F, G, H, I, M | 16 A, B, C, D, E, F, G, H, I, M | 17 A, B, C, D, E, F, G, H, I, M | 18 A, B, C, D, E, F, G, H, I, M | 19 A, B, C, D, E, F, G, H, I, M | 2D A, B, C, D, E, F, G, H, I, M | 21 A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 22 A, B, C, D, E, F, G, H, I, M | 23 A, B, C, D, E, F, G, H, I, M | 24 A, B, C, D, E, F, G, H, I, M | 25 A, B, C, D, E, F, G, H, I, M | 26 A, B, C, D, E, F, G, H, I, M | 27 A, B, C, D, E, F, G, H, I, M | 28 A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 29 A, B, C, D, E, F, G, H, I, M | 30 A, B, C, D, E, F, G, H, I, M | | | | | |
| Hours: 24 | Hours: 24 | | | | | |

Total Hours: 720        Charge per hours: $35.00              Total Due: $25,200.00

Have you provided services prior to the accident? No

I expect to be paid for all services provided,

I declare the above information to be true and accurate and about services were performed as indicated.

04/30/17                                          04/30/17

(Date)                                            (Date)

(Signature of party performing services)          (Signature of insured)

AFFIDAVIT OF ATTENDANT CARE SREVICES PEFORMED

Name of Insured:

Yolanda Thomas

Date of Incident: 11/24/14

Claim#22569H8

30

Service Provider's Name:

One Life Care Services

Describe specifically what attendant care services were provided:

A. Assistance with Hygiene
B. Grooming
C. Bathing
D. Toileting
E. Transferring/Positioning
F. Physical Therapy Oversight
G. Eating
H. Meal Preparation

I. Medication Management
J. Care of Health Equipment
K. Management of Finances
L. Wound Care
M. Safety Supervision

On the following calendar, please indicate: (a) the services by letter; (b) the dates on which those services were performed; and (c) the number of hours required for performance of those services for each date.

**Month: August**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours:24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 8 | 9 | 1D | 11 | 12 | 13 | 14 |
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 15 | 16 | 17 | 18 | 19 | 2D | 21 |
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 29 | 30 | 31 | | | | |
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | | | | |
| Hours: 24 | Hours: 24 | Hours: 24 | | | | |

Total Hours: 744        Charge per hours: $35.00            Total Due: $26,040.0

Have you provided services prior to the accident? No

I expect to be paid for all services provided,

I declare the above information to be true and accurate and about services were performed as indicated.

_____  8/31/16            _____ 8/31/16
(Signature of party performing services)   (Date)        (Signature of insured)    (Date)

**AFFIDAVIT OF ATTENDANT CARE SREVICES PEFORMED**

Name of Insured:
Yolanda Thomas                    Date of Incident: 11/24/14

Claim#:
22569H830
Service Provider's Name:
One Life Care Services

Describe specifically what attendant care services were provided:

A. Assistance with Hygiene
B. Grooming
C. Bathing
D. Toileting                          I. Medication Management
E. Transferring/Positioning            J. Care of Health Equipment
F. Physical Therapy Oversight          K. Management of Finances
G. Eating                              L. Wound Care
H. Meal Preparation                    M. Safety Supervision

On the following calendar, please indicate: (a) the services by letter; (b) the dates on which those services were performed; and (c) the number of hours required for performance of those services for each date.

**Month: December**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours:24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 8 | 9 | 1D | 11 | 12 | 13 | 14 |
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 15 | 16 | 17 | 18 | 19 | 2D | 21 |
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 29 | 30 | 31 | | | | |
| A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | A, B, C, D, E, F, G, H, I, M | | | | |
| Hours: 24 | Hours: 24 | Hours: 24 | | | | |

Total Hours: 744          Charge per hours: $35.00          Total Due: $26,040.0

Have you provided services prior to the accident? No

I expect to be paid for all services provided,

I declare the above information to be true and accurate and about services were performed as indicated.

_(signature)_                 12/31/16
                              (Date)
(signature of party performing services)

_(signature)_                 12/31/16
(Signature of insured)        (Date)

**AFFIDAVIT OF ATTENDANT CARE SREVICES PEFORMED**

Name of Insured:

Yolanda Thomas                    Date of Incident 11/24/14

Claim#

22569H830

Service Provider's Name:

One Life Care Services

<u>Describe specifically what attendant care services were provided:</u>

A. Assistance with Hygiene

B. Grooming

C. Bathing

D. Toileting                          I. Medication Management

E. Transferring/Positioning           J. Care of Health Equipment

F. Physical Therapy Oversight         K. Management of Finances

G. Eating                             L. Wound Care

H. Meal Preparation                   M. Safety Supervision

On the following calendar, please indicate: (a) the services by letter; (b) the dates on which those services were performed; and (c) the number of hours required for performance of those services for each date.

**Month: February**

| 1 A, B, C, D, E.F, G, H,I,M | 2 A, B, C, D, E.F, G, H,I,M | 3 A, B, C, D, E.F, G,H,I,M | 4 A, B, C, D, E.F, G,H,I,M | 5 A, B, C, D, E.F, G,H,I,M | 6 A, B, C, D, E, F, G,H,I,M | 7 A, B, C, D, E.F, G, H,I,M |
|---|---|---|---|---|---|---|
| Hours: 24 | Hours: 24 | Hours: 24 | Hours:24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 8 A,B, C,D, E.F, G, H,I,M | 9 A,B, C, D, E.F, G, H,I,M | 1D A, B, C, D, E,F,G H,I,M | 11 A, B, C, D, E.F, G,H,I,M | 12 A, B, C, D, E.F, G,H,I,M | 13 A, B, C, D, E, F, G,H,I,M | 14 A, B, C, D, E.F, G, H,I,M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 15 A,B, C,D, E.F, G, H,I,M | 16 A,B, C, D, E.F, G, H,I,M | 17 A, B, C, D, E.F, G,H,I,M | 18 A, B, C, D, E.F, G,H,I,M | 19 A, B, C, D, E.F, G,H,I,M | 2D A, B, C, D, E, F, G,H,I,M | 21 A, B, C, D, E.F, G, H,I,M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| 22 A,B, C,D, E.F, G, H,I,M | 23 A,B, C, D, E.F, G, H,I,M | 24 A, B, C, D, E.F, G,H,I,M | 25 A, B, C, D, E.F, G,H,I,M | 26 A, B, C, D, E.F, G,H,I,M | 27 A, B, C, D, E, F, G,H,I,M | 28 A, B, C, D, E.F, G, H,I,M |
| Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 | Hours: 24 |
| | | | | | | |

Total Hours: 672          <u>Charge per hours: $35.00</u>          Total Due: $23,520.00

Have you provided services prior to the accident? _No_____

I expect to be paid for all services provided,

I declare the above information to be true and accurate and about services were performed as indicated.

_____ ☞ 02/30/17                    _____ 02/30/17

(Signature of party performing services)   (Date)        (Signature of insured)          (Date)

# EXHIBIT C

P&A FILE NO. 11-43565

**Johnny Elmo Hunter, Jr.**
2/19/2018

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

YOLANDA THOMAS,

                Plaintiffs,

                              Case No. 17-cv-10558

        -vs-                    Hon. Mark. A. Goldsmith

STATE FARM MUTUAL AUTOMOBILE INSURANCE

COMPANY,

                Defendants.

_____/

PAGE 1 to 41

      The Deposition of JOHNNY ELMO HUNTER, JR.,

      Taken at 38505 Woodward Avenue, Suite 100,

      Bloomfield Hills, Michigan,

      Commencing at 2:39 p.m.

      Monday, February 19, 2018

      Before Cynthia Ann Chyla, RPR, CSR, 0092.



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Johnny Elmo Hunter, Jr.
2/19/2018

Page 2

1    APPEARANCES:

2    MS. LAUREN SITTO   P82019

3    Dailey Law Firm, P.C.

4    36700 Woodward Avenue, Suite 107

5    Bloomfield Hills, Michigan   48304

6    248-744-5005

7    Lauren@daileylawyes.com

8        Appearing on behalf of the Plaintiff.

9

10   MR. CHASE M. KUBICA   P74151

11   Plunkett Cooney

12   38505 Woodward Avenue, Suite 2000

13   Bloomfield Hills, Michigan   48304

14   248-594-2703

15   Ckubica@plunkettcooney.com

16       Appearing on behalf of the Defendant.

17

18

19           *     *     *     *     *

20

21

22

23

24

25



Johnny Elmo Hunter, Jr.
2/19/2018

Page 3

1                        TABLE OF CONTENTS

2    Witness                                          Page

3    JOHNNY ELMO HUNTER, JR.

4    EXAMINATION BY MR. KUBICA                              4

5

6

7                        INDEX TO EXHIBITS

8               (Exhibits retained by counsel)

9

10   Exhibit                                          Page

11   DEPOSITION HUNTER EXHIBIT A                           4

12   Disability certificates and attendant

13

14

15

16

17

18

19

20

21

22

23

24

25



Johnny Elmo Hunter, Jr.
2/19/2018

Page 4

1              Bloomfield Hills, Michigan

2              Monday, February 19, 2018

3              About 2:39 p.m.

4       DEPOSITION HUNTER EXHIBIT A

5       Disability certificates and attendant

6       care calendars

7       WAS MARKED BY COUNSEL

8       FOR IDENTIFICATION.

9              JOHNNY ELMO HUNTER, JR.,

10   having first been duly sworn, was examined and testified

11   on his oath as follows:

12   EXAMINATION BY MR. KUBICA:

13   Q.   Please state and spell your full name for the record.

14   A.   Johnny Elmo Hunter, Jr., J-O-H-N-N-Y, E-L-M-O, Hunter,

15        H-U-N-T-E-R, Jr., J-R.

16              MR. KUBICA:  Let the record reflect that this

17        is the deposition of Johnny Hunter, Jr. given pursuant

18        to Notice and for all the uses allowable under the court

19        rules.

20   BY MR. KUBICA:

21   Q.   I believe this was a subpoenaed deposition asking you to

22        be here today.  In connection with that subpoena I asked

23        that you provide some documentation which we have

24        already marked as Exhibit A which you provided, from

25        what I can tell is some disability certificates and some



Johnny Elmo Hunter, Jr.
2/19/2018

Page 5

1        attendant care calendars; correct?

2    A.   Correct.

3    Q.   And is that the basis -- is that your entire file as it

4        relates to Yolanda Thomas?

5    A.   Yes.

6    Q.   Okay.  Had you ever had the opportunity to give a

7        deposition before?

8    A.   Yes.

9    Q.   About how many times and when was the last one?

10   A.   The last one was 2001 -- not about this case, another

11       case.

12   Q.   Okay.  So the last time you gave a deposition --

13   A.   2001.

14   Q.   Okay.

15   A.   One other case.

16   Q.   All right.  And it was an auto case?

17   A.   No.

18   Q.   No.  Okay.

19            Just to kind of give you a feeling of how the

20       process goes, everything that's being said is being

21       recorded, so with that being said, please respond with

22       yes or no.  Um-hmms or unh-unhs cannot be recorded.

23       That's the court reporter's pet peeve.

24            In addition to I know in the ordinary course

25       of conversation you'll anticipate what someone is asking

Johnny Elmo Hunter, Jr.
2/19/2018

Page 6

1     you and you'll volunteer an answer in order to kind of

2     streamline the conversation.   I just ask you try not to

3     do that and I'll try to do the same.   The reason being

4     is you may understand my question but the court reporter

5     can't take down both of us talking at the same time, so

6     I ask you please just listen, give it a second and then

7     respond.   It's very difficult to do and I'm guilty of it

8     myself.   We'll try to do that.   Okay?

9  A.  Yes.

10 Q.  If you need to take a break for whatever reason let me

11     know.   Okay?

12 A.  Um-hmm.   Yes.

13 Q.  And I ask please keep your voice up just for the court

14     reporter's benefit.   Okay?

15 A.  Yes.

16 Q.  All right.   Can I have your current address where you

17     reside?

18 A.  2181 Eve Drive, Troy, Michigan 48083.

19 Q.  Okay.   And we're here today to talk about an individual

20     by the name of Yolanda Thomas.   Do you know that name?

21 A.  Yes.

22 Q.  Okay.   And how is it that you know that name?

23 A.  I take care of her.

24 Q.  Your company does?

25 A.  Yes.



Johnny Elmo Hunter, Jr.
2/19/2018

Page 7

1   Q.   What's the name of your company?

2   A.   **One Life Care Services.**

3   Q.   And when you say your company, are you the owner?

4   A.   **Yes.**

5   Q.   Are you the sole owner?

6   A.   **Yes.**

7   Q.   And do you have any employees?

8   A.   **Yes.**

9   Q.   How many as we sit here today?

10  A.   **Sixteen.**

11  Q.   And what does One Life Care Services do?

12  A.   **Placement service.  We take care of patients.**

13  Q.   You said replacement or placement?

14  A.   **Placement.**

15  Q.   Explain that a little bit.

16  A.   **Sometime a person is staying somewhere where it's not**

17       **comfortable for them to be in the situation they might**

18       **be in, so we place them in a new home and take care of**

19       **them.**

20  Q.   Okay.  Did you do that in this particular case?

21  A.   **Yes.**

22  Q.   So you physically had Yolanda Thomas placed in a new

23       home?

24  A.   **Moved from the home she was at because the steps, she**

25       **couldn't get up and down the steps, and placed in a**



Johnny Elmo Hunter, Jr.
2/19/2018

Page 8

1          better home.

2    Q.    We'll get into that in a little bit.

3                You said you have 16 employees?

4    A.    Contract employees, yes.

5    Q.    And they're all contract?

6    A.    Yes.

7    Q.    Do you own any other businesses?

8    A.    Yes.

9    Q.    Which other businesses?

10   A.    Title insurance company.

11   Q.    Okay.  Anything else?

12   A.    Me and my wife own a day care.

13   Q.    And what's your wife's name?

14   A.    Bernadette Williams Hunter.

15   Q.    Any other businesses?

16   A.    No.

17   Q.    And how long have you owned the title insurance company?

18   A.    Since 2002.

19   Q.    What about the day care?

20   A.    Since 2016.

21   Q.    What about One Life Care?

22   A.    Since 2014.

23   Q.    When in 2014 did you become incorporated?

24   A.    I didn't become incorporated in 2014.  I became

25         incorporated in 2016.


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313-567-8100

Johnny Elmo Hunter, Jr.
2/19/2018

Page 9

1   Q.   So in 2014 how did you form your business?

2   A.   Basically just attendant care.  Just taking care of

3        people.

4   Q.   You weren't licensed?

5   A.   I'm not licensed now to take care of people.

6   Q.   I'm sorry?

7   A.   I'm not licensed now to take care of people.  I hire

8        people that's licensed to take --

9   Q.   Is your business licensed?

10  A.   Yes, yes.

11  Q.   Has your business been licensed since 2014 for One Life

12       Care Services?

13  A.   No.

14  Q.   It wasn't licensed until when?

15  A.   2015, '15 or '16.  I'm not sure of the right date but I

16       can find out.

17  Q.   How can you find out?

18  A.   By going to the State of Michigan when I registered the

19       business.

20  Q.   The LARA?

21  A.   Yes.

22  Q.   So when you first opened your doors in 2014 for One Life

23       Care Services -- is that fair, sometime in 2014?

24  A.   Yes.

25  Q.   Do you know when in 2014?



Johnny Elmo Hunter, Jr.
2/19/2018

Page 10

```
 1   A.   I'm thinking February.

 2   Q.   So early in '14?

 3   A.   Yes.

 4   Q.   Okay.  And how did you go about opening your business

 5        then?  Did you file any documents?

 6   A.   No, I didn't file documents because I was under someone

 7        else's business.  I just was doing the placements,

 8        finding the clients for them and placing them into their

 9        business.

10   Q.   What business were you under at that time?

11   A.   It was -- what's the guy's name?  There was three guys.

12        I'm not for sure.  I'll get you the information.

13   Q.   So explain --

14   A.   I don't want to tell you the wrong name of their

15        company, so ....

16   Q.   Okay.  So explain to me how that worked then.  In 2014

17        you had your own company --

18   A.   Yes.

19   Q.   -- but you were working under this other --

20   A.   My company wasn't registered in 2014.  Basically

21        everything I did with my company, I got a percentage of

22        what they did with their company.

23   Q.   I'm sorry, say that again?

24   A.   Everything I did with their company, I got a percentage

25        of what they did with their company.  They paid me a
```



Johnny Elmo Hunter, Jr.
2/19/2018

Page 11

```
 1      percentage to place clients, I find clients, place

 2      clients with them, help them out with their services

 3      that they offer.

 4   Q. Okay.

 5   A. Nurse services, physical therapy services.  I meet

 6      different clients to bring them into their company.

 7   Q. How is it you meet your clients?   .

 8   A. Through attorneys, hospitals, people that I know.

 9   Q. How did you meet Yolanda Thomas?

10   A. From her sister.

11   Q. Who's her sister?

12   A. Louise Thomas from Chicago.

13   Q. How do you know Louise?

14   A. Been knowing them for years.

15   Q. Okay.  So you eventually became incorporated and

16      licensed --

17   A. Yes.

18   Q. -- as One Life Care Services in either '15 or '16?

19   A. Yes.

20   Q. You don't know when?

21   A. No.  I'll get you that information.

22   Q. Okay.  And you yourself don't hold any licenses for any

23      sort of attendant care services; correct?

24   A. What you mean by attendant care services?  Can you

25      explain.
```



Johnny Elmo Hunter, Jr.
2/19/2018

Page 12

```
 1   Q.   Do you own any licenses yourself?

 2   A.   As a physical nurse or physical therapist?

 3   Q.   For a nurse or licensed care provider or any sort of

 4        license?

 5   A.   There's no licenses for a care provider unless you're a

 6        physical therapist or RN nurse.  But as a person to

 7        care, yes.  No.

 8   Q.   There's no license?

 9   A.   There's no license.

10   Q.   You have no licenses; right?

11   A.   No.

12   Q.   And you said you have 16 contract employees now?

13   A.   Yes.

14   Q.   And do they have licenses?

15   A.   Yes.

16   Q.   What kind of licenses do they have?

17   A.   Some of them are RN nurses, some of them are physical

18        therapy.  I contract with other companies that are

19        physical therapy companies, like Premier Physical

20        Therapy, I contract with them.

21   Q.   Okay.  Now, in connection with the documents you

22        provided me marked as Exhibit A there's some calendars,

23        Affidavits of Attendant Care Services Performed is the

24        title of that document.  What one are you looking at

25        there?  What document is this?
```



Johnny Elmo Hunter, Jr.
2/19/2018

Page 13

1   A.   This is August of '17.

2   Q.   Is this form something that you generate?

3   A.   Yes.

4   Q.   Your company?

5   A.   Our company generates, yes.

6   Q.   Do you make this form?  Did you make this particular

7        form?

8   A.   Yes, yes, I mean -- yeah.

9   Q.   At the bottom of that there's a name -- there's two

10       names?

11  A.   Yes.

12  Q.   Do you know whose names those are?

13  A.   Yes.

14  Q.   What names are those?

15  A.   Johnny Hunter and Yolanda Thomas.

16  Q.   So that's your signature at the bottom there?

17  A.   Yes.

18  Q.   And I want to look through all of Exhibit A, so this is

19       going to be a little painstaking but I want you to

20       confirm that this is your signature on all of these.

21            August of 2017, that's your signature?

22  A.   Yes.

23  Q.   And whose other signature is on there?

24  A.   Yolanda Thomas.

25  Q.   Yolanda Thomas?



Johnny Elmo Hunter, Jr.
2/19/2018

Page 14

```
 1    A.    Yes.

 2    Q.    What about September of '17?

 3    A.    Yes.

 4    Q.    Both your name --

 5    A.    Johnny Hunter and Yolanda Thomas.

 6    Q.    October of '17?

 7    A.    Johnny Hunter and Yolanda Thomas.

 8    Q.    February of '17?

 9    A.    Johnny Hunter and Yolanda Thomas.

10    Q.    March of '17?

11    A.    Johnny Hunter and Yolanda Thomas.

12    Q.    April of '17?

13    A.    Johnny Hunter and Yolanda Thomas.

14    Q.    November of '16?

15    A.    Johnny Hunter and Yolanda Thomas.

16    Q.    December of I assume of 2016?

17    A.    Johnny Hunter and Yolanda Thomas.

18    Q.    Okay.   January of '17?

19    A.    Johnny Hunter and Yolanda Thomas.

20    Q.    July of '16?

21    A.    Johnny Hunter and Yolanda Thomas.

22    Q.    September of 16th?

23    A.    Johnny Hunter and Yolanda Thomas.

24    Q.    October of '16?

25    A.    Johnny Hunter and Yolanda Thomas.
```



```
                        Johnny Elmo Hunter, Jr.
                              2/19/2018

                                                     Page 15

  1   Q.   March of '16?

  2   A.   Johnny Hunter and Yolanda Thomas?

  3   Q.   April of '16?

  4   A.   Johnny Hunter and Yolanda Thomas.

  5   Q.   May of '16?

  6   A.   Johnny Hunter and Yolanda Thomas.

  7   Q.   January of '16?

  8   A.   Johnny Hunter and Yolanda Thomas.

  9   Q.   February of '16?

 10   A.   Johnny Hunter and Yolanda Thomas.

 11   Q.   November of '15?

 12   A.   Johnny Hunter and Yolanda Thomas.

 13   Q.   December of '15?

 14   A.   Johnny Hunter and Yolanda Thomas.

 15   Q.   September of February?

 16   A.   Johnny Hunter and Yolanda Thomas.

 17   Q.   And October of '15?

 18   A.   Johnny Hunter and Yolanda Thomas.

 19   Q.   Okay.  Now, for each one of these particular forms, it

 20        says charge per hour, $35?

 21   A.   Correct.

 22   Q.   Where does that charge come from?

 23   A.   From the service that I surrender, the assisting,

 24        hygiene, grooming, bathing, toileting, positioning,

 25        physical therapy oversight.  It's not physical therapy
```



Johnny Elmo Hunter, Jr.
2/19/2018

Page 16

1       but once she comes back from physical therapy make sure

2       she's still raising her arm and doing physical therapy,

3       but not giving physical therapy because we are note

4       licensed to do that.  Eating, preparing meals, safety

5       services, make sure she's taking her medicine,

6       medication management, making sure she's taking her

7       medicine on time when she's supposed to.

8    Q.  Because you signed each one of these forms, were you the

9        actual person there?

10   A.  No, my company.  I'm part of my company.  So I do be

11       there, I have other clients be there also.

12   Q.  Okay.  So who in particular performed the services for

13       you?

14   A.  Sometimes I do, sometimes my contractors do.

15   Q.  Okay.  But you have no idea by looking at any of these

16       calendars who was actually there doing them?

17   A.  Well, yeah, I do.  I have other papers with my company

18       that will give you a breakdown of hours, how many hours

19       they spent with her.

20   Q.  Okay.

21   A.  Different people.

22   Q.  But my question --

23   A.  On this form?

24   Q.  Yes.  You'd have no idea -- you said you have 16

25       employees?



Johnny Elmo Hunter, Jr.
2/19/2018

Page 17

| 1 | A. | Yeah, me. |
|---|----|-----------|

1   A.   Yeah, me.

2   Q.   So you were there?

3   A.   Yeah, I did most of it, yeah, me and my other employees.

4   Q.   Okay.  So let's look at August of '17, the first one in

5        your documents there.

6   A.   Okay.

7   Q.   12 hours a day?

8   A.   Um-hmm.

9   Q.   Every single day?

10  A.   Yep.

11  Q.   For the month of August 2017?

12  A.   Yes.

13  Q.   Were you there?

14  A.   I was there probably off and on 8 hours.

15  Q.   Okay.

16  A.   I come 2 or 3 hours, other people will come, a

17       contractor would come, sit for maybe 3 or 4 hours and I

18       come back, relieve them, somebody else will come in,

19       different contractors.

20  Q.   Do you have forms that document when you left and when

21       someone else came in?

22  A.   Yes, I do.

23  Q.   Okay.  And why are those not included with what you

24       brought today?

25  A.   Because I just brought the forms that -- from Yolanda



Johnny Elmo Hunter, Jr.
2/19/2018

Page 18

1          Thomas and me, not from my contractors.

2     Q.   Do your contractors keep separate notes?

3     A.   Yes, they do.

4     Q.   And, again, you didn't bring those?

5     A.   No, I didn't.

6     Q.   And looking at this form alone you couldn't tell me how

7          long you were there each day?

8     A.   Well, I spent so much time there, so I can't say I was

9          there 12 hours straight but I was there the majority of

10         the time until somebody else came over to take my place.

11    Q.   Right.  But my question was:  You can't say -- on

12         August 12th, '17 you can't say you were there for

13         12 hours based on the form?

14    A.   No, I can't say I was there 12 hours.

15    Q.   The forms you have at your office or wherever they are,

16         would you be able to tell me how long you were there on

17         August 1, 2017?

18    A.   Yes.

19    Q.   I'm going to ask you to provide those --

20    A.   Yes.

21    Q.   -- within 10 days.  You can mail them, drop them off

22         here, whatever is easier, e-mail, fax.

23    A.   Yes.

24    Q.   The rate of $35, where does that number came from?

25    A.   I pay my contractors $14 an hour when they're there.



Johnny Elmo Hunter, Jr.
2/19/2018

Page 19

1        Then you add on -- I pay rent there.  I pay -- buy food

2        for there.  So that's -- I came up with $35.

3    Q.  Is that something you just made up?

4    A.  Well, I think that's the standard rate.

5    Q.  Where do you get that from standard?

6    A.  Going on the website and look at it.

7    Q.  What website?

8    A.  With RN nurses, and most companies in this business

9        charge that or more.

10   Q.  And where is Miss Thomas living now?

11   A.  She's living in Rochester Hills.

12   Q.  Is that a building you own?

13   A.  No, that's her apartment complex.  That's me and my

14       company name is on.

15   Q.  So you own the particular apartment?

16   A.  No, no.  I'm leasing the apartment complex for her to be

17       there.

18   Q.  That particular apartment?

19   A.  That particular unit, yes.

20   Q.  Okay.  How much do you have to pay in rent for that

21       apartment?

22   A.  $1,050.

23   Q.  And you actually provide food for Miss Thomas as well?

24   A.  Yes.

25   Q.  And how much do you spend on food?



Johnny Elmo Hunter, Jr.
2/19/2018

Page 20

1   A.   I have the bills.  I'm not for sure.  I have the bills.

2        I'll get them over to you.

3   Q.   Now, with all these calendars that you provided from

4        September 2015 through -- I believe the most recent is

5        August of 2017?

6   A.   Correct.

7   Q.   It's 7 days a week?

8   A.   Yes.

9   Q.   Okay.  And that you have physically been there every

10       single day?

11  A.   Yes.

12  Q.   During that period of time?

13  A.   Yes.

14  Q.   Not missing one day?

15  A.   No, not really.  I come there or I come at night.

16  Q.   From that period of time, from September of 2015 to the

17       last calendar you just provided of August of 2017,

18       you've gone to that apartment?

19  A.   Not that apartment, but she lived other places before

20       that.

21  Q.   Okay.  Where did she live before that?

22  A.   She lived on Mackay before that.  I'm not for sure of

23       the address.  I'm not for sure of the address.

24  Q.   But other than Mackay and this Rochester apartment?

25  A.   Yes.  I placed her from Mackay to the Rochester



Johnny Elmo Hunter, Jr.
2/19/2018

Page 21

```
 1       apartment.

 2   Q.  So other than -- those are the only two places you've

 3       gone, correct, to provide these services for

 4       Miss Thomas?

 5   A.  Yes.

 6   Q.  And do you know the street in Rochester where she lives?

 7   A.  She lives at Upper Ridge Drive, Apartment 5.

 8   Q.  And she still resides there?

 9   A.  Yes.

10   Q.  And these attendant care services that are noted on this

11       form, these forms from September of '15 through August

12       of '17, are you still performing those services?

13   A.  Yes.

14   Q.  Seven days a week?

15   A.  Yes.

16   Q.  And the last calendar I have is for 12 hours a day.  Is

17       that still the rate that's --

18   A.  Yes, that's the rate being quoted.  I switched from 4,

19       12, 8, 24, depending what the doctor prescription is.

20   Q.  Have you ever talked to her doctor --

21   A.  No.

22   Q.  -- writing her prescriptions?

23   A.  No.

24   Q.  Do you know who that doctor is?

25   A.  No, I don't offhand.  She have a transportation company
```



Johnny Elmo Hunter, Jr.
2/19/2018

Page 22

1       that takes her to the doctors.

2   Q.  Are you involved with that transportation company at

3       all?

4   A.  No.

5   Q.  So explain to me how you go about filling out these

6       particular affidavits for attendant care?

7   A.  Well, you put down what you do for that 12-hour period.

8       As you see, the alphabets relate to what I done in the

9       12-hour period.

10  Q.  Is that done daily?

11  A.  Daily, seven days a week.

12  Q.  For instance, when -- you're the one putting -- making

13      these forms; correct?

14  A.  Once I get my report in from -- if the nurse been there

15      she's going to tell me exactly what she done.  These are

16      all the daily things.  She got to bathe every day, she

17      got to eat every day.  These are daily things she has to

18      do.

19  Q.  Based upon the forms you submitted, for instance, the

20      grooming, the bathing, the toileting, for whatever it

21      adds up to, say 12 hours, that doesn't necessarily mean

22      that you did those things?

23  A.  That means that I did most of them.  We take her to the

24      bathroom.  If I'm not there, my contractor will take her

25      to the bathroom.



Johnny Elmo Hunter, Jr.
2/19/2018

Page 23

1    Q.   So when it has that A, B, C, D, E, so on, that doesn't

2         necessarily mean you had done that, someone in your

3         company had done that, you or that person?

4    A.   Yeah, me or that person.

5    Q.   Why don't the individuals who perform the services when

6         you're not there sign these forms?

7    A.   Well, I just -- as I own the company I sign them myself,

8         I mean because that's what they done.  They report to

9         me.  I pay them.  I sign the forms myself and turn them

10        in.

11   Q.   Do you review the forms from your employees when you

12        make this form with your employee?  Are they there?

13   A.   It's a daily routine.  This is a daily routine.  This

14        got to be done every day, and it's done within the hours

15        it's got to be done.  She goes to the bathroom four or

16        five times a day.  She has to eat three or four times a

17        day.  These are daily routine forms she has to do.

18   Q.   When you say eat, she physically can feed herself, fork

19        to mouth?

20   A.   She physically feeds herself.  We help her out, because

21        sometime she -- you know, one of the hands might tremor

22        or something to that effect, so we help her out feed

23        herself, but we try to get her back strong again.  We

24        try to get her to do the most she can do.  She can't

25        cook because she don't have the memory to cook.  She

Johnny Elmo Hunter, Jr.
2/19/2018

Page 24

| | | |
|---|---|---|
| 1 | | leave the stove on or she burn something up.  She |
| 2 | | doesn't have that thought pattern of, you know, doing |
| 3 | | things that supposed to be done, so .... |
| 4 | Q. | There's no other owners to One Life Services? |
| 5 | A. | No.  It's an LLC. |
| 6 | Q. | And when you complete one of these forms what do you do |
| 7 | | with them, one of these affidavits for a month? |
| 8 | A. | I file them in my company and send it to the attorney |
| 9 | | company. |
| 10 | Q. | Did Miss Thomas ever inform you that she didn't want any |
| 11 | | attendant care? |
| 12 | A. | No.  When I came in I was called in for attendant care. |
| 13 | Q. | And when did you -- |
| 14 | A. | Because the insurance company stopped paying the |
| 15 | | attendant care or she didn't have attendant care at |
| 16 | | first.  They were working on and the insurance company |
| 17 | | stopped paying so I was called in. |
| 18 | Q. | Who called you in? |
| 19 | A. | Her sister, and I sat down with them. |
| 20 | Q. | But did Yolanda ever personally tell you she didn't want |
| 21 | | any attendant care? |
| 22 | A. | No. |
| 23 | Q. | And why exactly are you performing this attendant care? |
| 24 | | Why does she need it? |
| 25 | A. | Because she's sick.  I mean, she can't -- there's a lot |



Johnny Elmo Hunter, Jr.
2/19/2018

Page 25

1 of things she can't do for herself.

2 Q. Sick with what?

3 A. A lot of things she can't do herself.  She can't bathe

4   herself, she can't lift her arms.  She can't get out

5   bed.

6 Q. Why?

7 A. I assume from the accident.

8 Q. But you don't know?

9 A. Not offhand but I assume it's from the accident.  I'm

10   not a doctor so I can't tell you physically, you know,

11   why she can't do these things.

12 Q. Okay.  Now, let's look at, again, Exhibit A, your -- the

13   documents you provided in connection with some of those

14   documents is some disability certificates.  Okay?

15 A. Um-hmm.

16 Q. Is that a yes?  They're in there?

17 A. What you mean, prescriptions?

18 Q. Prescriptions, yes.

19 A. Yes.

20 Q. Let's look at, for instance, the month of 11 -- the one

21   from 11-21-2016.  It's the order date 11-21-16.

22 A. You said 11-2016?

23 Q. Yes, 11-21-2016.

24 A. I see '15.  11-22-2015.

25     MS. SITTO:  It's before that one.



Johnny Elmo Hunter, Jr.
2/19/2018

Page 26

1    A.    12-18-2015.

2              MS. SITTO:  No, go back the other way.

3    A.    You said '16, though; correct?

4    BY MR. KUBICA:

5    Q.    Yes.

6    A.    Okay.  11-21-2016.

7    Q.    All right.

8    A.    Okay.

9    Q.    Do you know how you get these forms?

10   A.    They come from the doctor.

11   Q.    Directly to you?

12   A.    No.  It comes directly to her case manager, I assume.

13   Q.    You'd agree with me that on this form, then, there is no

14         assessment as to why 12 hours a day, 7 days week was

15         needed for attendant care; correct?

16   A.    Correct.

17   Q.    And let's look at the prescription from 2-14-17, so it's

18         like 7 pages in from the top.

19   A.    Okay.

20   Q.    So you're looking at order date of 2-14-17.

21   A.    Um-hmm.

22   Q.    The assessment chronic pain due to trauma, do you have

23         any idea what that means?

24   A.    Well, she's in a lot of pain.

25   Q.    Do you have any idea as to what specific is in pain as



Johnny Elmo Hunter, Jr.
2/19/2018

Page 27

1    it relates to that assessment?

2    A.    No.

3    Q.    Okay.  And you've spent every day with Yolanda Thomas

4          since September of 2015?

5    A.    Yes.

6    Q.    Okay.  Were you there today?

7    A.    Yes.

8    Q.    What is she complaining of?

9    A.    Her arm, her knee, her neck.  It's hard to get out of

10         the bed.  She complains about -- she can't remember a

11         lot of things, but she -- she's in pain and she's not

12         taking no pain med.

13   Q.    She's not taking any medication?

14   A.    No, not prescribed to her.

15   Q.    Is she taking medication that's not prescribed to her?

16   A.    No, no.

17   Q.    Do you know when she stopped taking medication?

18   A.    No, I don't.  She taking medication but not pain

19         medication.

20   Q.    What kind of medication does she take?

21   A.    I'm not for sure of the kind of it but I know she had to

22         take about six pills a day and she had to take them at

23         certain times, so ....

24   Q.    Do you know when that was stopped?  Was it 2018?

25   A.    For her pain medication?



Johnny Elmo Hunter, Jr.
2/19/2018

Page 28

1    Q.   When she took it.  You said she's not taking any
2         medication?
3    A.   I said not her pain medication.
4    Q.   When did pain medication stop?
5    A.   I'm not for sure but I know she's not taking the pain
6         medication.
7    Q.   Do you know if she's taking medications now?
8    A.   Yes, she's taking --
9    Q.   For what?
10   A.   Different things.  I think something for her liver or
11        something for her knee for water, something -- I'm not
12        for sure what it all is, but ....
13   Q.   Are you giving her those medications?
14   A.   No, I just make sure she takes them on time.  She takes
15        them herself.
16   Q.   So you have no idea what they actually are?
17   A.   No.
18   Q.   Do you put them in pill boxes?  Do you physically hand
19        them to her?
20   A.   We actually set them up on her table where she know she
21        should take this, take that.
22   Q.   When you say we, is there generally more than one person
23        there?
24   A.   Sometime two.  Sometimes my contractor is there,
25        sometime I be there at the same time.



Johnny Elmo Hunter, Jr.
2/19/2018

Page 29

```
 1   Q.   Who are some of the contractors that take care of

 2        Miss Thomas?

 3   A.   You want the names?

 4   Q.   Yes.

 5   A.   I can get the names from on the form.  I can get you the

 6        names.

 7   Q.   And does Miss Thomas spend every single night at the

 8        Rochester location or the Mackay the location?

 9   A.   Rochester.

10   Q.   When did you start providing care to her?

11   A.   In 2000 probably about '15.

12   Q.   When in '15?

13   A.   The end of '15.

14   Q.   Okay.  Since that time has Miss Thomas spent every

15        single night at either the Mackay address or the

16        Rochester address?

17   A.   Not every single night, no.

18   Q.   Where else would she go?

19   A.   She was in the hospital a couple times.

20   Q.   Where?

21   A.   At Receiving Hospital.

22   Q.   When was she in Receiving?

23   A.   I'm not sure of the dates.

24             She was in a coma.

25   Q.   When was she in a coma?
```



Johnny Elmo Hunter, Jr.
2/19/2018

Page 30

1   A.   I'm not for sure of the dates.  I think the attorney

2        should have those.

3              MS. SITTO:  The medical records.

4   A.   Because we send them over to the attorney office.

5   BY MR. KUBICA:

6   Q.   But as far as the care that your company rendered --

7   A.   Yes.

8   Q.   -- would have only been at Mackay and at the Rochester

9        Upper Ridge Lane addresses; correct?

10  A.   Yes.  Not at the Corace Drive address.

11  Q.   The what?

12  A.   Not the Corace Drive address.

13  Q.   What's the Corace Drive address?

14  A.   The other address she had for years ago, I guess.

15             MS. SITTO:  The Mackay.

16  A.   The Mackay then Corace Drive.

17  BY MR. KUBICA:

18  Q.   Okay.  She lived at Mackay and Corace Drive?

19  A.   She lived at Mackay when I started with her and then she

20       went to Rochester Hills.  Corace Drive when she, before

21       all this happened, I believe.

22  Q.   Oh, before Mackay?

23  A.   Right.

24  Q.   Okay.  Do you or your company ever take Yolanda Thomas

25       anywhere?



Johnny Elmo Hunter, Jr.
2/19/2018

Page 31

1    A.    Yes, sometimes.

2    Q.    Where would you take her?

3    A.    Out to lunch or out to dinner sometimes, just to get her

4          out of the house.

5    Q.    Other than lunch or dinner, anywhere else that you would

6          take her?

7    A.    No.  I apologize, we have to go to one or two doctors'

8          appointments when the transportation didn't come, we

9          took her.

10   Q.    Do you know the specific date of Miss Thomas's auto

11         accident?

12   A.    It was 11-24-2014.

13   Q.    Do you know an individual by the name of Nyla Perrin?

14   A.    Yes.

15   Q.    Who is Nyla Perrin?

16   A.    That's her I guess caregiver/friend.

17   Q.    What do you mean caregiver?

18   A.    Not the caregiver, but that's the one that takes her

19         back and forth to the doctor's.

20   Q.    Is that her case manager?

21   A.    Case manager, yes.

22   Q.    Do you know if she's a licensed case manager?

23   A.    I don't know.

24   Q.    When you say said case manager earlier is that who you

25         were referring?



Johnny Elmo Hunter, Jr.
2/19/2018

Page 32

```
 1    A.    I mean, she handles all her stuff, so I figured she was

 2          the case manager.

 3    Q.    You send your documents, these affidavits to Miss

 4          Perrin?

 5    A.    No.

 6    Q.    Just to their attorney?

 7    A.    Just to their attorney.

 8    Q.    Yolanda's attorney.  I'm sorry.

 9    A.    Yes.

10    Q.    Did you ever bill through the State of Michigan?

11    A.    No.

12    Q.    So, for instance, with the bathing and the toileting, do

13          you ever perform that for Miss Thomas?

14    A.    No, my contractors do.

15    Q.    Okay.  What about the grooming, do you ever do that?

16    A.    Yes.

17    Q.    What sort of grooming do you do for her?

18    A.    Comb her hair, make sure she's got lotion on, lotion on

19          the arms, back, feet, yes.

20    Q.    Has Miss Thomas ever had any incidents in the home that

21          required any medical care?

22    A.    What you mean?  Did she fall or --

23    Q.    Fall?

24    A.    No.

25    Q.    Needed to go to have something checked out on an
```



Johnny Elmo Hunter, Jr.
2/19/2018

Page 33

1    emergency basis or anything when you were there?

2  A.  No.

3  Q.  When you ultimately got licensed in 2015 or '16, what

4      license did you have to obtain?

5  A.  Placement, my company is a placement company.

6  Q.  I'm sorry?

7  A.  A placement company.

8  Q.  So you had to be licensed for that?

9  A.  Yes.

10 Q.  What about for providing attendant care services?

11 A.  No, there's no license provided for that.

12 Q.  Are all your contract employees paid the same?

13 A.  Some are paid cash, some paid check.

14 Q.  You pay some employees cash?

15 A.  Yes.

16 Q.  Why would you pay some cash, some checks?

17 A.  Because they needed the cash at that time.  They're

18     contractor employees.

19 Q.  Do you offer your employees any benefits?

20 A.  No.  They're contractors.

21 Q.  But when I asked if you paid them all the same amount,

22     some you said $14, some are 20?

23 A.  Some I owe them 11, some I owe them 14, some I owe --

24     not all get paid the same across the board.

25 Q.  And what do you base the difference in paying each of



Johnny Elmo Hunter, Jr.
2/19/2018

Page 34

1      them?

2   A.   Might be there at night, stay the night.  Some might

3        have to stay the night because they miss some hours, so

4        they take hours from the hours from 3:00 to 6:00 in the

5        morning.  So they stay there during the night.

6   Q.   So if they were there at night they get paid more?

7   A.   Yes.  They have to stay with her to make sure she's

8        okay, trying not to get out of the bed or out the door

9        or something.

10  Q.   Is that the only difference in payment, the time of day?

11  A.   Time of day.  Because the services are provided, the

12       same services, everybody provide the same services, make

13       sure she eats, make sure she gets a bath every day, make

14       sure she gets a shower, or make sure she's groomed.

15  Q.   When you get there, when you actually go there some

16       days, are you the first person that Miss Thomas sees

17       that today?

18  A.   No.

19  Q.   Or somebody there?

20  A.   Somebody might be there at the time, or some days it

21       might be me the first person she saw.

22  Q.   When you say somebody might be there, somebody from your

23       company?

24  A.   Yes, somebody from my company would be there.

25  Q.   But some days when you go there --



Johnny Elmo Hunter, Jr.
2/19/2018

Page 35

1   A.   I'm the first person in the door, yes.

2   Q.   Is she sleeping in bed at that time?

3   A.   Yes.

4   Q.   And do you have a key?

5   A.   Yes.

6   Q.   And you're saying you don't need to be licensed in any

7        sort of fashion to perform attendant care; correct?

8   A.   For attendant care, but for physical therapy I have a

9        company that does that or nurses if she needs

10       temperatures or vitals and all that, then we hire a

11       nurse to come in.

12   Q.   Separate from one of your contract employees?

13   A.   Yes.

14   Q.   It would be a different entity that comes in?

15   A.   Yes, that would come in.

16   Q.   So did you personally ever conduct an evaluation of

17       Miss Thomas on what she can and cannot do?

18   A.   No.  I'm not the doctor, so ....

19   Q.   So what did you rely on for that?

20   A.   Just because -- what I do for her?

21   Q.   Yes.

22   A.   Just because how she is, sometimes she can't get up.

23       Get her up, get her bathed.

24   Q.   You didn't do any valuations of her yourself?

25   A.   I don't understand what you mean?



Johnny Elmo Hunter, Jr.
2/19/2018

Page 36

```
 1    Q.   In your files any sort of form or evaluation --

 2    A.   No.

 3    Q.   -- kind of going over Miss Thomas?

 4    A.   No.  Assessment form?

 5    Q.   Yes.

 6    A.   The care she would need?

 7    Q.   Yes.

 8    A.   No.

 9    Q.   Nothing like that?

10    A.   Well, I have one form when I first started, when I first

11         went out and talked to her.  I have one form about what

12         I feel she would need more so as in health.

13    Q.   And this is what you decide?

14    A.   No, this is what the doctor -- this, you know, the

15         prescription came from the doctor, so I went by that.

16    Q.   But your form that you have, what's that based on?

17    A.   Just my company form saying okay, we can bathe her, she

18         don't have open wounds, she can take a shower.  She's

19         not, you know, she's not allergic to this lotion, she

20         can be lotioned, stuff like that.

21    Q.   Did you ever talk to the doctor who provided you those

22         prescriptions?

23    A.   No, no.

24    Q.   And you already indicated you're not qualified to

25         administer any sort of medications?
```



Johnny Elmo Hunter, Jr.
2/19/2018

Page 37

1  A.  No, I'm not qualified.

2  Q.  Has the level of care that you're providing at all

3       changed in the course of the care you provided?

4  A.  No.

5  Q.  And I know you said, you know -- I'm sorry, I didn't

6       mean to cut you off.

7  A.  No, I'm saying no.  Still the same, still bathe her,

8       still feed her.  She can't cook for herself.

9  Q.  Nothing's changed?

10 A.  No.  And some of the things are 4 hours a day.  Like

11      this one here, 8-1-16, we only did 4 hours a day.  So

12      them 4 hours she was kind of like maybe better, we

13      didn't have to give her so many hours.

14 Q.  If nothing has changed, why did the hours change?

15 A.  I don't know.  You have to talk to the doctor because he

16      only prescribed the 4 hours.  Maybe he saw something

17      that was getting better.

18 Q.  What you as a company render, nothing changed?

19 A.  No, she still need.

20 Q.  So there's some days where she's --

21 A.  She's up, I get there she might be up.  She might be

22      sitting in bed watching TV.

23 Q.  Have you left the State of Michigan at all since

24      September 2015?

25 A.  What you mean, move to another place?



Johnny Elmo Hunter, Jr.
2/19/2018

Page 38

```
 1   Q.   Like vacation, left the state, went --

 2   A.   No.

 3   Q.   -- up north for the weekend or ...?

 4   A.   That's still the State of Michigan.

 5   Q.   But Im just saying --

 6   A.   Yeah, I take trips up north, play golf then.

 7   Q.   Okay.  How often do you do that?

 8   A.   Once a year.

 9   Q.   Is it a week?  Weekend?

10   A.   Weekend.

11             MR. KUBICA:  Go off the record for a quick

12        second.

13             (An off the record discussion was held)

14             MR. KUBICA:  All right.  We can go back on.

15   BY MR. KUBICA:

16   Q.   Again, I want to reference you to your documents you

17        provided starting with October of 2016, the calendar

18        itself.

19   A.   Okay.

20   Q.   All right.  So the month of October of 2016, the form

21        you signed indicated attendant care was being performed

22        4 hours a day every day of the month of October of '16?

23   A.   Yes.

24   Q.   And the same holds true for November of 2016 -- give you

25        a second to get there.
```



Johnny Elmo Hunter, Jr.
2/19/2018

Page 39

1   A.   Okay, yes.

2   Q.   Twelve hours a day; correct?

3   A.   Yes.

4   Q.   Why the jump from 4 to 12?

5   A.   It was the start of a new prescription, I believe.

6        That's what he ordered.  That's what the doctor ordered.

7   Q.   Okay.  And then continuing on for December of 2016 --

8        let me know when you find that.

9   A.   Okay.

10  Q.   Again, 12 hours every single day?

11  A.   Seven days a week.

12  Q.   Seven days a week?

13  A.   Um-hmm.

14  Q.   Is that a yes?

15  A.   Yes.

16  Q.   And you would have provided some services each day of

17       those 7 days a week?

18  A.   Yes.

19  Q.   Same for January of '17?

20  A.   Yes.

21  Q.   And at that point in time was that at the Rochester

22       location, she moved to Rochester at that point?

23  A.   I believe so.

24  Q.   Okay.  Do you know when she moved from Mackay to

25       Rochester, about?



HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO        313-567-8100

Johnny Elmo Hunter, Jr.
2/19/2018

Page 40

1   A.   I have it written down but I'm not for sure.

2   Q.   When you're at Miss Thomas's home what is she typically

3        doing?

4   A.   She's in the bed most of the time.

5   Q.   Does she do anything else around the house?

6   A.   Watch TV.

7   Q.   Does she play any sort of games?

8   A.   No.

9   Q.   Computer?

10  A.   No.

11  Q.   And just finally:  So it's your testimony today that the

12       attendant care services that you and your company

13       provided is from September 2015 to the present time as

14       we sit here today?

15  A.   Yes.

16  Q.   And that is 7 days a week?

17  A.   Yes.

18  Q.   And those service were performed at either the Mackay

19       address or the Rochester aspect?

20  A.   Yes.

21  Q.   Okay.

22            MR. KUBICA:  That's all I have.

23            MS. SITTO:  I'm all set.

24            (The Deposition concluded at 3:25 p.m.)

25



Johnny Elmo Hunter, Jr.
2/19/2018

Page 41

1                    CERTIFICATE OF NOTARY

2

3     STATE OF MICHIGAN   )

4                         )   SS

5     COUNTY OF OAKLAND   )

6

7              I, Cynthia Ann Chyla, Certified Shorthand

8        Reporter, a Notary Public in and for the above county

9        and state, do hereby certify that the above deposition

10       was taken before me at the time and place hereinbefore

11       set forth; that the witness was by me first duly sworn

12       to testify to the truth, and nothing but the truth, that

13       the foregoing questions asked and answers made by the

14       witness were duly recorded by me stenographically and

15       reduced to computer transcription; that this is a true,

16       full and correct transcript of my stenographic notes so

17       taken; and that I am not related to, nor of counsel to

18       either party nor interested in the event of this cause.

19

20

21

22       Cynthia Ann Chyla, CSR-0092

23       Notary Public,

24       Oakland County, Michigan

25     My Commission expires:  05-12-2023



# EXHIBIT D

FEB 1 9 2019

STATE OF MICHIGAN
DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
BUREAU OF COMMUNITY AND HEALTH SYSTEMS

<u>AFFIDAVIT OF CANDACE PILARSKI</u>

1. I am a program consultant for the Adult Foster Care and Camps Licensing Division. This Division is in the Bureau of Community and Health Systems, Michigan Department of Licensing and Regulatory Affairs.

2. As a Program Consultant, my responsibilities include, but are not limited to, providing consultation to applicants, licensees, and the general public about statues and administrative rules governing adult foster care licensing.

3. I am often asked by applicants and the general public if certain activity would require an adult foster care license. I refer those inquiring to the Adult Foster Care Facility Licensing Act, 1979 PA 218, MCL 400.701 *et seq.*

4. If I were required under Court Order to testify about what activities require an adult foster care license, I would state that all the following statutes determine which activities require an adult foster care license:

   a. MCL 400.713(1) prohibits a person, corporation, etc. from establishing or maintaining an adult foster care facility unless licensed by the department.

   b. MCL 400.703(4) defines an "adult foster care facility" to be "a governmental or nongovernmental establishment that provides foster care to adults." An "adult foster care facility includes facilities and foster care family homes for adults who are aged, mentally ill, developmentally disabled, or physically disabled who require supervision on an ongoing basis but do not require continuous nursing care."

   c. MCL 400.703(1) defines an "adult" to be:
      (a) A person 18 years of age or older.
      (b) A person who is placed in an adult foster care family home or an adult foster care small group home according to section 5(6) or (8) of 1973 PA 116, MCL 722.115.

   d. MCL 400.703(8) defines "aged" to be "an adult whose chronological age is 60 years of age or older or whose biological age, as determined by a physician, is 60 years of age or older."

   e. MCL 400.705(5) defines "mental illness" to be "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to

1

recognize reality, or ability to cope with the ordinary demands of life."

   f.  MCL 400.704(3) defines "developmental disability" to be the "term as defined in section 100a of the mental health code, 1974 PA 258, MCL 300.1100a."

   g.  MCL 400.706(2) defines "physical disability" to be "a determinable physical characteristic of an individual that may result from disease, injury, congenital condition of birth, or functional disorder."

   h.  MCL 400.704(7) defines "foster care" to be "the provision of supervision, personal care, and protection, in addition to room and board, for 24 hours a day, 5 or more days a week, and for 2 or more consecutive weeks for compensation."

   i.  If the activities provided by a person, corporation, etc. do not meet all the elements of the definition of "foster care" at MCL 400.704(7), that person, corporation, etc. does not need an adult foster care license.

   j.  MCL 400.707(7) defines "supervision" to be the "guidance of a resident in the activities of daily living, including all of the following:
      (a) Reminding a resident to maintain his or her medication schedule, as directed by the resident's physician.
      (b) Reminding a resident of important activities to be carried out.
      (c) Assisting a resident in keeping appointments.
      (d) Being aware of a resident's general whereabouts even though the resident may travel independently about the community."

   k.  MCL 400.706(1) defines "personal care" to be the "personal assistance provided by a licensee or an agent or employee of a licensee to a resident who requires assistance with dressing, personal hygiene, grooming, maintenance of a medication schedule as directed and supervised by the resident's physician, or the development of those personal and social skills required to live in the least restrictive environment."

   l.  MCL 400.706(5) defines "protection" to be "the continual responsibility of the licensee to take reasonable action to ensure the health, safety, and well-being of a resident, including protection from physical harm, humiliation, intimidation, and social, moral, financial, and personal exploitation while on the premises, while under the supervision of the licensee or an agent or employee of the licensee, or when the resident's assessment plan states that the resident needs continuous supervision."

5.  MCL 400.703(4) excludes from the definition of "adult foster care facility" the following:

(a) A nursing home licensed under article 17 of the public health code, 1978 PA 368, MCL 333.20101 to 333.22260.

(b) A home for the aged licensed under article 17 of the public health code, 1978 PA 368, MCL 333.20101 to 333.22260.

(c) A hospital licensed under article 17 of the public health code, 1978 PA 368, MCL 333.20101 to 333.22260.

(d) A hospital for the mentally ill or a facility for the developmentally disabled operated by the department of health and human services under the mental health code, 1974 PA 258, MCL 330.1001 to 330.2106.

(e) A county infirmary operated by a county department of health and human services under section 55 of the social welfare act, 1939 PA 280, MCL 400.55.

(f) A child caring institution, children's camp, foster family home, or foster family group home licensed or approved under 1973 PA 116, MCL 722.111 to 722.128, if the number of residents who become 18 years of age while residing in the institution, camp, or homes does not exceed the following:

    (i) Two, if the total number of residents is 10 or fewer.

    (ii) Three, if the total number of residents is not less than 11 and not more than 14.

    (iii) Four, if the total number of residents is not less than 15 and not more than 20.

    (iv) Five, if the total number of residents is 21 or more.

(g) A foster family home licensed or approved under 1973 PA 116, MCL 722.111 to 722.128, that has a person who is 18 years of age or older placed in the foster family home under section 5(7) of 1973 PA 116, MCL 722.115.

(h) An establishment commonly described as an alcohol or a substance use disorder rehabilitation center, a residential facility for persons released from or assigned to adult correctional institutions, a maternity home, or hotel or rooming house that does not provide or offer to provide foster care.

(i) A facility created by 1885 PA 152, MCL 36.1 to 36.12.

(j) An area excluded from the definition of adult foster care facility under section 17(3) of the continuing care community disclosure act, 2014 PA 448, MCL 554.917.

6. MCL 400.726a(1) indicates that a "resident of an adult foster care facility who is enrolled in a licensed hospice program is not considered to require continuous nursing care" and therefore is excluded from the definition of "adult foster care facility."

7. On December 27, 2018, Governor Richard Snyder signed into law HB 5505, which became Public Act 557 of 2018. 2018 PA 557 amended the Adult Foster

3

Care Facility Licensing Act to change, in part, what activity constitutes adult foster care and requires an adult foster care license. These changes, which are effective March 28, 2019, are as follows:

a. A "co-occurring enhanced crisis resident program" will require an adult foster care license even though it will rehabilitate adults for alcohol or substance use disorder. MCL 400.703(4)(h). MCL 400.704(1) will define a "co-occurring enhanced crisis residential program" as "a program approved by the department of health and human services for providing short-term intensive mental health and substance use disorder services that is able to address the mental health needs, substance use disorder needs, or both of an individual through enhanced programming and staffing patterns that are reviewed and approved by the department of health and human services."

b. MCL 400.703(4)(k) will add an exemption from "adult foster care facility" for "a private residence with the capacity to receive at least 1 but not more than 4 adults who all receive benefits from a community mental health services program if the local community mental health services program monitors the services being delivered in the residential setting."

c. MCL 400.703(5) will change the definition of "adult foster care family home." The current definition of "adult foster care family home" applies to the care of "6 or fewer adults" in a private residence. The definition has been changed to apply to the care of "at least 3 but not more than 6 adults" in a private residence.

d. MCL 400.703(7) will change the definition of "adult foster care small group home." The current definition of "adult foster care small group home" applies to the care of "12 or fewer adults." The definition has been changed to apply to the care of "at least 3 but not more than 12 adults."

e. MCL 400.703(10) will define "board," a previously undefined term found in the definition of "foster care." "Board" will be "food service provided at the adult foster care facility."

f. MCL 400.704(8) (previously MCL 400.704(7)) will provide a new definition of "foster care." It states that "the provision of supervision, personal care, and protection in addition to room and board" must be provided at a single address to require licensure. Further, "[p]roviding room under a landlord and tenant arrangement does not, by itself, exclude a person from the licensure requirement under this act."

4

Further, Affiant sayeth not.

_____
CANDACE PILARSKI, Affiant

On the 12th day of February_____, 2019, before me, a Notary Public in and for said county, appeared the above Affiant, who, upon oath, stated that the Affiant has read the foregoing affidavit, state sit to be true and that the signing of same is the Affiant's free act and deed.

> SHAWNA E. PIERCE
> Notary Public, State of Michigan
> County of Ionia
> My Commission Expires Aug. 03, 2019
> Acting in the County of Ingham

_____
Notary
Public,
County of
State of
My commission expires:

5

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

YOLANDA THOMAS

     Plaintiff,

-v-

                                      Case No:  17-CV-10558
                                        Hon: Mark A. Goldsmith

STATE FARM MUTUAL AUTOMOBILE
INSURANCE CO.,

     Defendant.

_____/

| DAILEY LAW FIRM PC | PLUNKETT  COONEY |
|---|---|
| Brian Thomas Dailey (P39945) | Michael W. Slater (P65227) |
| Robert M. Smith (P31191) | Chase M. Kubica (P74151) |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 36700 Woodward Avenue, Suite 107 | 38505 Woodward Ave, Ste. 100 |
| Bloomfield Hills, MI 48304 | Bloomfield Hills, MI 48304 |
| (248) 744-5005 | (248) 594-2703 |

_____/

### AFFIDAVIT OF JOHNNY ELMO HUNTER, JR.

STATE OF MICHIGAN         )
                           ) ss
COUNTY OF OAKLAND      )

     I, Johnny Elmo Hunter, Jr.., after first being duly sworn, depose and state as follows:

     1.     I am the owner of One Life Care Services.

     2.     That One Life Care Services provided "Attendant Care" for Yolanda Thomas as the result of two motor vehicle accidents, pursuant to the Michigan No-Fault Law..

3.    That One Life Care Services does not and has not operated as an Adult Foster Care Facility pursuant to the Adult Foster Care Facility Licensing Act, 1979 PA 218, MCL 400.701 *et seq.*

4.    That One Life Care Services does not have an Adult Foster Care Facility License because, pursuant to MCL 400.704(7) he is not required by law to do so.

5.    That while One Life Care Services provided "Attendant Care" pursuant to the Michigan No-Fault Law, it did not provide supervision nor protection as defined under the aforementioned Adult Foster Care Facility Licensing Act.

6.    That he was advised by Candace Pilarski, an Adult Foster Care Program Consultant for the Bureau of Community and Health Systems Licensing Unit that because One Life Care Services did not provide supervision nor protection for Yolanda Thomas while provided "Attendant Care", it did not require a license from the State of Michigan to operate as an Adult Foster Care Facility.

Further Affiant sayeth not.

JOHNNY ELMO HUNTER, JR..

Subscribed and sworn to before me
on the 13th day of Feb., 2019.

Notary Public:
____Oakland____ County, Oakland acting in
My Commission Expires:
3-22-2020

SCOTT A. DECIUS
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF OAKLAND
My Commission Expires March 22, 2020
Acting in the County of Oakland